Our first case this morning is TQ Delta versus a lot of parties, CommScope Holding Company, etc. 2024-1587-1588. Mr. Lampkin. Good morning, thank you. May it please the court. I'd like to focus on infringement of the 008 patent, the erroneous jury instruction on damages before turning, if time remains, to the construction of the flag sign of the 008 patent. Mr. Lampkin, on pages 57 and 58 of the blue brief, you say, and I'm quoting, the court conceded it could find no, and then there's a quote internal, no precedent affirmatively holding that the cost savings approach is limited to the cost savings of the defendant, close quote. In fact, what the district court said was, while CommScope has pointed to no precedent, not that it could find no precedent, while CommScope has pointed to no precedent affirmatively holding that the cost savings approach is limited to the cost savings of the defendant, comma, TQ Delta has not pointed to any case in which the cost savings approach was premised upon savings to a non-party end user, such as AT&T here. Isn't your shortened quotation misleading to this court? It is imprecise, and I apologize for it. It should have said that the court noticed that neither party could identify cases either way, rather than attributing it to the court, and I apologize for that imprecision. And you also left off a major portion of... Yeah, that we could not find one either. As I should have said, it should have said neither party, and I apologize to the court for that. But the fact remains on that one is that, well, if we were going to turn to damages, it seems to me that the answer should have been very clear, that cost savings aren't limited to the actual accused infringer, but you... What authority did you point in the district court on this point about the scope of cost savings approach? So our principal case was Erickson versus D-Link, which says that you look to the incremental value the patent adds to the end user product. Was that authority premised upon savings to a non-party end user? No, D-Link was a benefit, but it wouldn't make sense to say cost savings can only go to the infringer, but benefits can go to their customers. No one, if you're talking about like, for example, a Prius hybrid drive, no one would say, oh, you look at the gas savings to Toyota, who makes it. You wouldn't look at the save money on gas. That was our exact theory here. And it's just plain error to try and say the opposite. You argue in your reply, the yellow brief at page 29, that your Rule 51 objection to the district court's damages inspection met the standards of Rule 51 for specificity. Okay. Rule 51 says a party who objects, I'm shortening it, must do so on the record stating distinctly the matter objected to and the grounds for the objection. Cite me to the federal rules of evidence which were implicated by the objection and how that was clearly articulated. Yeah, certainly. I think that if you take a look at the record and I'd ask the court to turn to 6386, which is where everybody was looking, this is the proposed instruction that Judge Gilstrap had before him. And that Judge Gilstrap says, and I'm reading from the record here, page 6189, says, let's turn to page 25. So everyone knows we're on page 25. Are there objections here? And then he's, Mr. Fink says, yes, from the plaintiff, the first paragraph and the second sentence begins, this approach relies on estimated costs. If you can follow along from the third line, this approach relies on estimated costs. He says, plaintiff subjects to language in that sentence and the following sentence, and we propose that the language be changed in the second sentence too. So now we can follow along. If you just start at third line, it starts in parallel. He says, the approach relies upon estimated costs, if any, that, and then he takes out the comscope save from and then inserts the making, using, or selling of the accused products save. Following along with that language and seeing what he was changing it to, which is what was happening in the courtroom, you can't miss that he's taking the two comscope out and putting in save to make it generic. The same thing for the next sentence. He says, the following sentence, plaintiff would change the language too. So if you start as inconsidering, that's the next sentence, inconsidering the amount of reasonable royalty damages under the cost savings model, that's all the same. You should focus on, that's all the same as well, whether comscopes, and then he makes a little change here. It says, make, use, or sale, and he changes it to making, use, or sale, and says, of the patented technology, and then he doesn't say, allowed it to, taking out comscope, avoided taking a different, more costly course of action. So he's now taking comscope out of it again, and everybody's following along on this page. This is exactly what's happening. You know, the objection did not attempt to remove the last reference to comscope in this instruction, which, you know, you didn't read, but it says, so how much comscope saved by using the accused products instead of taking the more costly course of action. So, you know, if I'm just thinking, if I'm the district court judge, you know, I wouldn't exactly know what counsel was trying to do here, given that comscope still is being referenced here, and the focus is still on comscope, and that's entirely consistent with the proposed jury instruction that was sent by email to the court at A6414, which made it very clear that what the plaintiff was looking for was cost savings by the defendant's infringement allowed it to avoid taking a different, more costly course of action. And my point is more procedural, and that is that what you've read is the proposed changes to the instruction, right? Yes, to delete, to get rid of. And what the rule says is that it has to state distinctly the matter objected to and the grounds for the objection. Yes. That's not in here. So under the Fifth Circuit precedent, in a case called Kroger in particular, the court will look and see if the basis is readily apparent, if it just has to give sufficient notice. I don't think anyone looking at... Dealing with questions of procedure, are we following our precedent or the Fifth Circuit's? Since this is a Fifth Circuit procedural issue not related to patent law, just for Rule 50, you would follow the Fifth Circuit precedent. But under Fifth Circuit precedent, you just have to give fair notice to the district court of the nature they are. Not related to patent law? Pardon? How is it not related to patent law? It's an objection to... It's whether or not there's a sufficient objection procedurally to put the district court on notice of the nature of the objection. And it's a damages question, probably comes from this court, but the procedural requirements for preserving it would be Fifth Circuit law. But the ordinary rule is you just have to give the district court fair notice, and it gives us fair notice. In fact, in Kroger itself, the objection was, I object to the omission of instruction number three, nothing more. But there had been previous things that gave the court notice about the nature of that objection. So that should be amply sufficient. Judge Chen, to turn to your question about the fact that there was a prior proposal that suggested that perhaps you could... Let's see. That it was... Yes. Comscope... 64-1-3. Yeah. Comscope-centric cost avoidance. Yeah. The key thing there is there's two key things about that. One is it says first, the first thing it says, it doesn't, the initial one says, reliance on estimated cost savings from use of the infringing product is a well-settled method. Savings from use. The user here isn't Comscope. They don't use the product. AT&T, the carrier, uses the product. So it's focused on use and the user. Now, there is that language you pointed out that says the standard can be met if... So that's just one example of how you would meet it. If the court had adopted that exact language, even though we objected to it later, there might be a problem. But the district court went further. He directed the jury sole focus, sole focus to Comscope's savings and omitted any other savings. And he also left off, what we added to is at the end, we quote the seminal case, Erickson versus D-Link, and say, you've got to look at what value adds to the end product, the end user product. That's the focus of the damages estimate. I think these are amply sufficient to put the district court on notice. But if the district court weren't on notice, the error here would be absolutely plain. It just cannot be that cost savings only are to the immediate infringer, and you ignore, when valuing the product, the fact that Prius owners save a lot of money on gas. You argue in the yellow brief, right in the same area on page 28, that the district court damages instruction was factually erroneous. I'm leaving out some language. Because it mischaracterized TQ Delta's damage theory. And the district court, this is the part I'm interested in, quote, later admitted, close quote, that it was, quote, incorrect, close quote. And you're citing to appendix 177. What there are you relying on for your view that the district court admitted it was incorrect? You know, Your Honor, I think that's, again, a place where if the district court doesn't say incorrect, that incorrect should not have been quotes. What we're pointing out is there's two pieces of it. Yeah, but you know, you're doing that a lot. Yeah. And I don't like it. And I don't blame you, Your Honor. This should not happen. And I apologize. Yes, it should not. But I think. It's not a question of apology. It's a question of misleading the court. I mean, I went back to the record and looked when you said that, obviously. Yeah. So the contrast we're drawing is from page 171 of the appendix, where he says that our expert, quote, testified that he used a cost savings model that relied on the cost savings at AT&T, Comscope's customer realized. So that's what our theory of the case was. Our theory of the case was Comscope's customer savings. And then the court told the jury that the model relies on Comscope saved from making, using, or selling. The cost they allowed it to avoid. And if so, how much Comscope saves. The district court understood exactly what our theory of the case was, that it was all about AT&T, not Comscope. It says it on page 171. And the district court's instructions concededly said, just look at Comscope. That's the point we should have made. And we should have made it differently. Turning back to the 008. By not making it, have you waived it? Pardon? I said, by not making it, have you waived it? No, Your Honor. There's an entire section of our brief that says the district court mischaracterized our theory of the case. Our theory of the case was that it's not Comscope's. And I don't think there can be a waiver there. We are specifically pointing to a failure, and we cite Wright and Miller, the idea that you get a theory of the case instruction and you can't give a wrong theory of the case instruction. It is error for district court to misdescribe your theory of the case. And that's what the jury instructions did. They said our theory is based on Comscope savings. And if you look at all the evidence, time and time again, the expert says over and over that he's measuring cost savings to AT&T. Appendix 5574, lines 4 to 7. Are you measuring cost savings to AT&T? Yes. 5658. You're here at cost savings to AT&T, the telephone carrier. Correct. Yes, that's right. So in this case, AT&T, yes. These are not cost savings to Comscope. Correct? Of course not. Over and over again in the trial record, our theory was savings to AT&T, and the district court's instruction excluded that. If I can turn into what you wanted to say for rebuttal, you can continue or save it. I would like to stay for rebuttal. Thank you, Judge Lurie. All right. Thank you so much. Mr. Shuman. Thank you, Judge Lurie. I may have pleased the court, Brett Shuman, for the appellee. I want to start with a question that Judge Wallach asked to Mr. Lamkin. Regarding damages, they have a major Rule 51 waiver problem, as we argued in the brief. You asked a question about which law applies on page 43 of our brief. We cite Fifth Circuit law. I think that's what Mr. Lamkin said, but then he watered down the standard a little bit. The Fifth Circuit requires under Rule 51 that the objection must be sufficiently specific to bring into focus the precise nature of the alleged error. Thus, an objecting party that fails to state the grounds for their objection does not comply with Rule 51. I think the transcript's pretty clear. T.Q. Delta's attorney tried to wordsmith a little bit the proposed instruction, proposed some different language, never stated an evidentiary objection to it, never mentioned AT&T, actually. And if your theory of the case that you want the trial judge to articulate correctly to the jury is that Comscope should be liable for AT&T's cost savings, you probably have to propose an instruction that says AT&T in it somewhere, and they didn't do that. And then, Judge Chen, to your question to Mr. Lamkin, if there was some parsing of the proposed instruction that the court handed out that morning of the charge, March 24, 2023, and there was no objection by Mr. Fink, T.Q. Delta's counsel, to the first sentence, there was some wordsmithing to the second sentence and part of the third sentence. And then, it's not just that he didn't object to the final part, which specifically mentioned cost savings to Comscope. He affirmatively said to the court, and the rest of the sentence would stay the same. That's a Rule 51 waiver, if I ever saw one. And then, with respect to plain error, as Mr. Lamkin argued, maybe they could still get there if there was plain error. But how can there be plain error when we still haven't heard a case that says, as a matter of law, Comscope must, in all cases, be liable for a third party's cost savings? It's an issue of proof. If they had, and this court does not need to resolve this case, adopt any rule one way or the other, in part because of the Rule 51 problem in the waiver. But also, this court's precedents, including the Stickel case cited in the briefs, make clear there could be a situation where a plaintiff proves that a third party's cost savings were passed along to the defendant, or the defendant reaped some of the benefits. The plaintiff could try to prove, in some case, it wasn't this case, that at the hypothetical negotiation, the licensing... Do we have the AT&T contract in the record, our record? I don't think you do. Why not? It appears it was in a confidential briefing below. I don't think there was an AT&T witness. I don't think there was a lot of evidence about AT&T, but yet they put on this theory that Comscope should be liable for AT&T's entire savings from deferring having to do fiber. DSL allowed them to delay doing fiber. That was Dr. Putnam's answer. I can't answer why it's not in our record. You make an argument, a 50-A argument, that they should have, before the jury instructions were submitted to the jury, made another 50-A. How much time was there for them? Well, the purported stipulation that they lead with. This is their lead argument, that my client stipulated to infringement, which a defendant, at the end of a trial, stipulating to infringement is not unheard of, but you got to have pretty good evidence, I think, to say that they... And in this case... I would say it's ambiguous at best, but from their viewpoint... So I can, I think, agree that it's ambiguous as to what happened, and that is why this court should defer to Judge Gilstrap's ruling on the Rule 50B motion. If there was a stipulation, which there wasn't, it had to have occurred in his chambers the night before the charge and the closing arguments. He presided over that. It was not transcribed. Then he passes out jury instructions at 7 a.m. in the morning to the parties, which I must say, I think there's a suggestion in Antiqui Delta's brief that that didn't give a lot of time. That's a lot more time than I've gotten when judges hand me instructions when I try cases. They get the instructions at 7 a.m. They have a charge conference on the record. At no point prior to submission of the case to the jury does TQ Delta say, wait a minute, we do not need to submit infringement. This was stipulated to. That was part of the questions I had that I never got to. I would say that the record is even better for Comscope and harder for TQ Delta, because there is a proposed instruction handed out at 7 a.m., and then at the charge conference, it is not objected to by TQ Delta. The proposed instruction, which was actually read to the jury, the defendants, Comscope, deny that they infringe any of the asserted claims. So there's a lot of attention and a lot of ink spilled on stipulation that somebody makes a declaration to a standard-setting organization, and we're going to refer to that as a SEP, as a standard essential patent. That's the stipulation at number 15 that TQ Delta hangs its hat on. But then the instructions also tell the jury, Comscope denies infringement of any of the asserted claims. That's Appendix 6370. At the formal charge conference on the record, TQ Delta did not have any objection to that instruction. That's Appendix 6186. And Judge Gilstrap so instructed the jury. So the jury was instructed that Comscope denies infringement, which at least when it came to the FRAND commitment section of the jury instructions, there are some very bold, clear statements that these patents are SEP patents. So it would be nice if you at least acknowledged that it would have been good if you had tried to clean that up. Well, I think I can acknowledge that as long as it doesn't lead to a reversal, Judge Chant. I mean, you have to explain yourself a little bit. Why were those statements so painfully clear? Sure. So in the list of stipulations— Nothing conditional about those statements. Well, Comscope— In isolation, they are very, very clear. Out of context. And Judge Gilstrap had all the context from the email that he received from—he asked the parties. There was a lot of history behind these instructions, and he asked the parties for their positions. And Comscope sent an email to Chambers. It's at 7564 on March 22nd. This is the Wednesday of the trial week, two days before the charge and the verdict, and said, our position is that these are neither essential—the 008 patent, which is what we're talking about, is neither essential nor infringed. That's their position. And that's consistent with the instruction that I just referred to, Comscope denies infringement. And Comscope said, but in the event that the jury finds any of those patents, the SEPs, the 008 patent infringe, then the patent must, by definition, be essential and subject to TQ Delta's RAND commitment. And so that's what Comscope put in writing to the judge. We deny infringement. We deny it's essential. But if the jury finds infringement—and this goes to your question, Judge Tim, because as you pointed out, this is really in the portion of the judge's charge where he's talking about damages. You've got a very complicated case here where TQ Delta put patents that they declared essential to the ITUT and patents that were not declared essential to the ITUT in the same case. And so Judge Gilstrap had to figure out how to tell the jury, well, we've got a couple of non-SEP patents where you have one set of damages rules. And then you have patents that TQ Delta claims are SEPs. And if they're found to be infringed, Comscope agrees they're SEPs. And now you have to do FRAN damages. That's the portion of the charge that you're referring to. So in the act— I understand. This is the context part, and we understand it. I do have a question about how to understand the scope and meaning of the jury instruction that actually got in front of the jury. Would you say that this instruction necessarily constrains the damages theory to just cost savings that Comscope enjoyed? Or would you say the jury instruction, despite its references to Comscope, nevertheless still is open enough that it permitted the jury to still consider all of TQ Delta's experts' testimony about downstream cost savings to your client's customers? It's the latter, Judge Ten. And Judge Gilstrap said that in his post-trial order, denying TQ Delta's trauma. We have to pick one. Theory one is, hey, they were the ones that came forward and said a Comscope-only type cost savings model. That's what they said in their email, and they kept it still in their objection, and then that's all they get. Or the theory is, well, despite all of these, you know, movements and communications and proposed objections, the whole ball of wax was always still on the table regardless. So the instruction specifically— so Judge Gilstrap said, look, Comscope's damages expert offered a damages theory of $5 million. We're here because TQ Delta got $11 million, and they want more. By the way, this was the fourth trial on these patents. Well, they wanted something like $90 million. They wanted $90 million. So why couldn't it be that the $11 million that the jury landed on was a number that was just a Comscope-only type of cost savings value? I don't think they were— all the downstream possible customer cost savings value, and that's how they ended up with just a fraction of the proposed $90 million. Two answers. One, I don't think they presented any evidence that Comscope saved $11 million. The Comscope's expert provided a hypothetical negotiation based on actual license agreements, and based on that, he said the licensee, Comscope, would have paid $5 million. Secondly, the instruction—I think this is really—maybe I misunderstood your question the first time. The first sentence of the instruction that was not objected to by anybody explicitly invited the jury to consider Comscope's customers. TQ Delta, the plaintiff, has proposed a cost savings model of calculating reasonable royalty damages that values the accused products that Comscope, the defendant, provides to its customers. So again, they were allowed to consider cost savings to customers, and I think in a case with the right proof about how the defendant in the case benefited from those cost savings to the customers, they might have gotten higher, but they got more than the amount that Comscope's expert offered the jury. That's why I asked you about the AT&T contract. Did the jury get that? I'm not aware, Your Honor, Judge Wallach. Sorry, I didn't try this case. I don't know whether they got the contract. I tried the other three cases in Delaware. I didn't try this case. If I might, in my remaining time, just a word or two on a couple of the other issues, if there are no more questions on damages. Judge Chen, do you have— Let's talk about phase shift amounts. Yeah, sure. So— I would think a mathematician or an engineer would think phase shift amount could encompass zero. Well, but the jury which found non-infringement were—I don't think they were all engineers. I'll just speculate. They were not all engineers. The claim construction that they were given, and TQ-Delta is not challenging the claim construction here. So the claim construction, computing the amount by which a phase shift is adjusted for each carrier signal. And Dr. Mattacetti, their expert, showed a table from the standard, 1270, which showed at least two carriers not adjusted at all. And I do want to be clear about— Separate from the subcarrier zero, right? So, yes. So one of them is the DC carrier zero. DC carrier zero. The DC carrier zero. And TQ-Delta argues in their brief, without any support in the record, that the DC carrier—it doesn't make sense from a physics perspective. I think they said it can't be rotated. Well, what they're saying is it has nothing to do with the modulation of the bit string. That's what they say. But there's another carrier, though, in table 1270 that the jury saw and that Dr. Mattacetti was cross-examined on when the pseudo-random number generator spits out 00. That's one of the possibilities. The table that the jury saw says you don't rotate that carrier. And under the claim construction they got, which is not challenged on appeal, that requires an adjustment for each carrier signal, that's enough evidence for the jury to have concluded not every one of the carriers that actually carries data bits gets shifted. And, you know, the court, Judge Gilstrap, denied their J-Mal on this. I think it was also a motion for a new trial. And he made reference to the skillful cross-examination of counsel because, as you know from the briefs, one of the arguments TQ-Delta makes is that, well, Comscope didn't put on an expert. So they're basically saying the jury had to believe Dr. Mattacetti. That's not the law, of course. And Judge Gilstrap pointed to, I think it's Mr. Scott Stevens, did the cross-examination. It's in the record. And it was skillful. He used the clock on the wall in the courtroom to demonstrate a phase shift of 90 degrees, 180 degrees, and zero degrees. And he walked Dr. Mattacetti through all that. And he obviously persuaded the jury that one of the data-carrying carriers does not get shifted. Lastly, I think I only have a few seconds left on the 835 patent, which was found invalid. This one, let me, yeah, the flag signal. This one is, there's overwhelming evidence of invalidity. The jury found invalidity. TQ-Delta primarily says, well, G992.1 can't be a flag signal because there's message data. Five judges, obviously none of them on this court yet, five judges have assessed this claim construction issue for flag signal. Judge Andrews in Delaware, Judge Gilstrap independently in a lengthy claim construction order, and three PTEB judges. And each of them have come to the same conclusion. The construction that is in the record for flag signal neatly distinguishes between the two embodiments. And under that construction, the jury properly found the patent invalid. The jury verdict is a general verdict. Thank you, counsel. As you can see, the signal in front of you is red. Thank you. There are two alternative grounds on which the jury could have found invalidity. And TQ-Delta focuses mainly on just one. Thank you. Mr. Lampkin has some rebuttal time. Thank you, because you saved that for me. If I could begin with the stipulation. This is judged according to the text of the stipulation itself. The Supreme Court has said so when you're looking at stipulations. There's a case called Braxton that says, you look at the stipulation itself. And it's not a question of whether the district court had a reasonable construction. It is, what is the right construction? And the stipulation, as Judge Chen pointed out, is unqualified. It says over and over again, these are SCP patents. And I know that my colleague here has said, defer to the district court, because there was an off-the-record charge conference. Well, first, you can't look at an off-the-record event unless you have a reconstruction hearing. And we'd welcome that if we wanted to have a reconstruction hearing. But the Fifth Circuit law says you can't look at it because it is off-the-record. What you look at is you look at the text itself. But even if you were to look beyond that, the fact that there were proposals beforehand that said things like, hey, it's up to you, the jury, to decide whether it's standard essential. The court is not instructing you whether or not this is standard essential. Those all disappeared. And what was left? What was left was clear language saying, the parties have stipulated that this is standard essential. And these other ones aren't standard essential. Are you saying we shouldn't be looking at context or structure of the overall set of jury instructions in verdict form? I think that the court can look at that context. But that context is absolutely clear. Because right up front, at the very beginning, before you get to damages, before you get friend, before you do anything, there's a stipulation that says, here's what you've stipulated to. And this is 6204, line 17. It says the S-008 patent and others are, quote, subject to commitments with the ITU and are referred to as standard essential patents, or SEPs. And then it gives a contradistinction. The 048 and 411 are not standard essential patents. One set is standard essential. One set isn't. No qualifications. No conditions. That is simply saying, this is TQ Delta's conception of what these patents are. They would like to believe these patents are SEP patents. And that's why they made this commitment to this SSO. And then these other patents are not SEP patents. And that's TQ Delta's understanding of all of this. No, I don't think it would be read that way, because this is the part you stipulated. It doesn't say it's TQ Delta's conception of it. And in fact, it's simply not the case that if it isn't an SEP, you would continue to have an ITU. There's no commitment to the ITU for FRAND if it doesn't actually turn out to be an SEP. There's evidence on the record for it. You could look at the ITU requirements and the commitment itself is there. If it's not actually an SEP, it's not subject to FRAND. And so when the court says it is stipulated SEP, it's not saying that we ourselves think it's SEP. The jury is not bound by what some international SSO says about whether a patent is an SEP patent. No, but it is bound by the stipulation in the instruction given by the district court judge, which is completely unconditional. Counsel says that they denied infringement. Of course. They still had not admitted at that point in time that they practiced the standard. We would have to show both that was standard essential, that got stipulated, and that they practiced the standard, which is why until closing, when they conceded they practiced the standard, the issue was still in dispute even though they had no evidence on their side. Turning very quickly to the cross-examination on zero amount. I have six seconds. We'll give you a minute because we gave your opponent. Oh, thank you very much. It can't be right. It's not possible to read the patent or the stipulation to mean that every shift, and we're not going to have a single carrier. This is a formula for all the carriers, would have to be in a non-zero amount. First, the very fact that we say non-zero amount tells us that the amount can be zero. Non-zero amount means there's something this amount that's a zero. But the construction is the amount of the phase shift by which the phase characteristic is adjusted.  Kind of baked in is this expectation there's going to be some kind of adjustment to the phase shift of every carrier signal such that we're scrambling each of their phase characteristics. Zero implies no shift, correct? For the standard and the patent itself, both sometimes refer to that as a no shift. But remember, every single equation in the patent will produce a zero shift. You would be excluding every single embodiment. The patent itself— That presented to the jury? It wasn't presented to the jury. But this is a construction that if they'd asked for it, it would have been rejected as wrong under the patent. And I don't think you can say the jury's decision is sufficient based on something that couldn't have been adopted, couldn't have been accepted as construction, and in fact was rejected by the very Delaware District Court that my co-counsel points to. But I think, Judge Chen, your point about context is very important here because this is a patent that talks about computing the amount, combining that amount to adjust the things by varying amounts. So if I had a recipe for a cake for sampling, and I directed the baker to compute the amount of baking soda add and in order to store about mix, in order to adjust the leavening by varying amounts, it might say add zero for a half box, add one teaspoon for a full box. No one will look at that instruction and say, oh my God, it's incoherent. It says adjust by varying amounts, and one of my amounts is zero. That's exactly what this patent does and exactly what the standard does. I think we've evened up the time. Thank you so much. I appreciate the indulgence, Judge Lurie. Thank you for your arguments. The case is submitted.